# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

          Plaintiff,

vs.                                                                            No. 15-cr-4080 WJ

MARCOS MONTOYA, JR.,

          Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

THIS MATTER comes before the Court upon Defendant Marcos Montoya, Jr.'s Motion to Suppress (**Doc. 31**) filed on July 5, 2016.  Having considered the parties' written and oral arguments, the testimony and evidence presented at the suppression hearing on October 6, 2016, and the applicable law, the Court finds that Defendant's Motion is not well-taken and, therefore, is **DENIED.**

## BACKGROUND

Between May 9, 2014 and February 13, 2015, Marcos Montoya, Jr. ("Defendant") was investigated for methamphetamine distribution.  Drug Enforcement Administration ("DEA") agents determined through surveillance and investigation, that Defendant was supplying methamphetamine from his residence, 10508 Andalusian SW, in Albuquerque, New Mexico. Based on this investigation, on February 13, 2015, officers obtained a warrant to search Defendant's residence.  On February 20, 2015 at approximately 6:00 am, police executed the warrant.  Mr. Montoya was home, along with his sister Letisha Montoya, and her minor child.

Upon execution of the warrant, Mr. Montoya and his sister were detained briefly with handcuffs to ensure everybody's safety.

During the search, officers located several containers of marijuana, a .22 caliber Derringer handgun, and a drug ledger. Mr. Montoya was placed under arrest as a result of the firearm and the drugs and removed from the residence, where he was taken to the Albuquerque DEA office for processing. Mr. Montoya did not wish to make any statements. About twenty to thirty minutes later, Ms. Montoya's handcuffs were removed once officers determined she was not a threat.

Ms. Montoya gave DEA officers consent to search four of the six vehicles that were present at the residence. DEA Special Agents Doug Gooch and Kirk Lemmon witnessed Ms. Montoya's consent, which was obtained using DEA's standard "Consent to Search" form. Ms. Montoya filled in the consent form with the four vehicles, and signed her name.

At around 7:30 am, in Mr. Montoya's bedroom closet, DEA Task Force Officer Oscar Villegas located a receipt listing three storage units (Units B-29, C-8, and D-19) rented at Bridge Self Storage in Albuquerque, New Mexico. Mr. Montoya's name was listed on the receipt as the person renting the storage units. No one else's name was listed on the receipt. Officer Villegas showed the receipt to Agent Gooch. Agent Gooch took the receipt and proceeded to question Ms. Montoya about the storage units. Agent Gooch did not testify at the suppression hearing because he was stationed overseas on business, but Officer Villegas and Agent Lemmon both explained they were standing close to Agent Gooch as he was speaking to Ms. Montoya about the storage units, and could easily hear the conversation. Ms. Montoya explained to Agent Gooch that the storage units referenced on the receipt were rented by her brother and that he had given her a set of keys. Agent Gooch requested the keys, and she provided them. Specifically,

she removed two keys from a key ring that she carried.  Officer Villegas testified that Ms. Montoya gave the keys willingly and did not appear nervous.  Agent Lemmon stated that Agent Gooch asked for permission to search the storage units, to which Ms. Montoya responded "yes." Ms. Montoya could not recall exactly how many storage units there were, and she stated that she could not remember the gate code to access Bridge Self Storage.  Agent Lemmon conversed with the other officers about what Ms. Montoya told Agent Gooch, and they believed Ms. Montoya had authority to grant consent to search the storage units.

After obtaining Ms. Montoya's consent, and in her presence, Agent Gooch filled in the consent form with the three storage units rented at Bridge Self Storage.  Agent Gooch explained to Ms. Montoya that he was going to use the existing consent form that she had already signed. Agent Lemmon's impression was that she had already given consent verbally and Agent Gooch informed her that he was going to write the storage units on the existing form.  Ms. Montoya did not object, and appeared willing and compliant.  At the hearing, Ms. Montoya testified that she did not remember this exchange taking place, and she denied that it happened.

Ms. Montoya stated that the only reason she provided the keys to the officers was so they would not cause property damage in the event the officers obtained a warrant to search the units. She claims that she asked the officers if they had a search warrant, and she gave them the keys so they would not have to cut the locks.  She testified that her brother gave her the keys as spares and that she never consented to search the storage units because they do not belong to her.

Ms. Montoya told the DEA officers she and her brother placed some of their late father's belongings in the storage units after he passed, along with some belongings from their house. She did not remember exactly how many storage units there were, but explained that she had been to one of them before.  She knew the storage units were located off Bridge in Albuquerque.

3

Ms. Montoya spoke with officers voluntarily, and was not threatened or confined.  Agent Lemmon and Officer Villegas both testified that Ms. Montoya remained calm and cooperative during the search, and never became upset.  No officers had their weapons drawn.  During the search, some agents carried assault rifles or handguns and several agents wore masks.  However, none of the agents carried their assault rifles at the "high and ready" position pointed at Ms. Montoya when she was talking to Agent Gooch.  Ms. Montoya was free to move around.  Agent Gooch spoke with Ms. Montoya in a calm tone.  Agent Lemmon also spent time speaking with Ms. Montoya and her child.  Agent Lemmon removed his mask, and placed his weapon to the side while he was speaking with Ms. Montoya and her child.

DEA officers searched Units D-19 and B-29 using the keys Ms. Montoya supplied. Officers located approximately four pounds of methamphetamine and numerous semi-automatic weapons, several of which were confirmed stolen.  Officer Villegas then sought and obtained a search warrant for Unit C-8.  That warrant was issued the same day, on February 20, 2015.

After searching the storage units, Agent Lemmon returned to the residence to continue speaking with Ms. Montoya to establish ownership of the residence, vehicles, and storage units. Ms. Montoya was not in distress, and spoke with Agent Lemmon cooperatively.  Agent Lemmon asked follow-up questions about the keys to the storage units.  Ms. Montoya confirmed that her brother gave her the keys, and she was able to describe where the storage units were located. She further described some of the items stored there.

Mr. Montoya filed a Motion to Suppress (**Doc. 31**) on July 5, 2016, urging the Court to suppress the evidence recovered from Units B-29 and D-19.  The United States filed a Response (**Doc. 34**) on July 19, 2016, and Mr. Montoya filed a Reply (**Doc. 36**) on August 2, 2016.  The Court held a hearing on the matter on October 6, 2016.

## LEGAL STANDARD

A district court cannot suppress evidence unless the movant proves that a search implicates Fourth Amendment interests.  *See United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995).  The Fourth Amendment protects individuals and their property from unreasonable searches and seizures by the government.  *See United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992).  "People generally have a reasonable expectation of privacy in a storage unit, because storage units are secure areas that 'command a high degree of privacy.'"  *United States v. Johnson*, 584 F.3d 995, 1001 (10th Cir. 2009) (quoting *United States v. Salinas–Cano,* 959 F.2d 861, 864 (10th Cir. 1992)).

A third party's consent can justify a warrantless search of the defendant's property when the third party has actual or apparent authority to grant such consent.  *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004).  "Even where actual authority is lacking ... a third party has apparent authority to consent to a search when an officer reasonably, even if erroneously, believes the third party possesses authority to consent."  *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007).  A third party has apparent authority "if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'" *United States v. Cos*, 498 F.3d 115, 1128 (10th Cir. 2007) (quoting *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999)).

The Tenth Circuit has articulated a two-step test for determining the validity of consent: "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). The question of whether consent to search is the product of duress or coercion is determined by the totality of

the circumstances. *See United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011).  The scope of a search is generally defined by its expressed object, and is limited by the breadth of consent given, applying an objective reasonableness test to measure what a typical person would have understood between the officer and the suspect.  *See United States v. Anderson*, 114 F.3d 1059, 1065 (10th Cir. 1997) (citations omitted).

 "[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident."  *Georgia v. Randolph*, 547 U.S. 103, 120 (2006).

## DISCUSSION

Mr. Montoya raises three principal arguments as to why the evidence found in Units B-29 and D-19 should be suppressed.  The Court addresses each argument in turn.

### I.  Ms. Montoya Had Apparent Authority to Consent to the Search of the Storage Units.

At the outset, the Court finds that the United States failed to establish that Ms. Montoya had actual authority to consent to the search.  The Tenth Circuit has held that "a third party has [actual] authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *United States v. Cos*, 498 F.3d at 1126 (quoting *Rith*, 164 F.3d at 1329).  It is the government's burden to establish the third-party consenter had actual authority to do so.  *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).  "Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search."  *Rith*, 164 F.3d at 1329–30.

At the suppression hearing, the United States did not offer evidence or testimony that Ms. Montoya utilized the storage units at will, without consent of Mr. Montoya.  Ms. Montoya testified that she told Agent Gooch she did not remember the code to the units, and that her brother rented the units after their father died so they could store some of their father's belongings.  These facts do not show Ms. Montoya had control for most purposes over the storage units or that she entered the units at will, without her brother's consent.  Furthermore, the United States did not argue Ms. Montoya had control for most purposes over the storage units.  Thus, Ms. Montoya did not have actual authority to consent to the search.

However, even without actual authority, a third party can have apparent authority to consent when an officer reasonably, *even if erroneously*, believes the third party possesses authority to consent.  *Andrus*, 483 F.3d at 716.  A third party has apparent authority "if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'" *Cos*, 498 F.3d at 1128 (quoting *Rith*, 164 F.3d at 1329).  The Court concludes the officers' belief that Ms. Montoya had authority to consent to the search was reasonable, even if it later turned out to be mistaken.

Defendant argues Ms. Montoya did not have apparent authority to consent to the search of the storage units because the receipt lists Mr. Montoya's name as the renter, which created an ambiguity that the officers improperly failed to investigate.  The Court disagrees.  The Court does not consider the receipt in a vacuum, but rather considers the totality of the circumstances giving rise to the officers' belief that Ms. Montoya had authority to and did consent to searching the storage units.

"The apparent authority inquiry is an objective one: we must determine whether 'the facts available to the officer at the moment ... warrant a man of reasonable caution [to believe] that the

consenting [individual] had authority over the premises[.]"' *Cos*, 498 F.3d at 1128 (quoting *Illinois v. Rodriguez*, 497 U.S. at 188) (internal quotation marks and citations omitted). The "reasonableness" requirement allows for officers to be mistaken in their assessment of a situation when executing their duties, as long as their mistakes are "those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Williams v. United States*, 323 F.2d 90, 94 n. 5 (10th Cir. 1963) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

The United States likens this case to *Kimoana*, where a third party granted consent to search a motel room who was not the registered renter of the room. 383 F.3d at 1221. The registered renter turned out to be the defendant. The third party carried keys to the room and told officers he was staying there with his cousins. He also told the officers he "did not care" if officers searched the room. *Id.* at 1219. The defendant argued the third party lacked apparent authority because he told the officer the hotel room "was not his" and argued the officer's belief as to apparent authority was unreasonable. *See id.* The Tenth Circuit held the third party had apparent authority to consent to search the hotel room. *See id.* at 1222. The Court noted "where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." *Id.* The government cannot meet its burden of establishing apparent authority if officers faced with an "ambiguous situation" proceed without making further inquiry. *See id.* "Warrantless entry is unlawful without further inquiry if circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent." *Id.* (quotation omitted).

The Tenth Circuit in *Kimoana* emphasized the court's duty to view the totality of the circumstances in evaluating the reasonableness of the officer's determination of apparent authority. *See id.* at 1222–23. Defendant claimed there was no apparent authority because the

8

officers were faced with ambiguous fact regarding the hotel room and to whom it belonged. *See id.* The Court reasoned, "Although [the third party] was not the registered property owner or renter, Officer Miner knew that [the third party] had a key to the room and that he had stayed there with his cousins." *Id.* at 1223 (alterations added). The Court refused to view the statement that the room was not his in a vacuum. *See id.* The third party may not have been the registered renter, but there were sufficient additional facts supporting apparent authority.

In contrast, in *United States v. Cos*, the Tenth Circuit held a third party guest of the defendant did not have apparent authority to consent to a search of the defendant's home. 498 F.3d at 1130. The third party had known the defendant for one month. She did not have keys to the defendant's home. *See id.* at 1117. She did not live with the defendant and did not keep any belongings in his home. *See id.* at 1118. Before entering the home, the officers did not ask the guest who she was or what relationship she had with the defendant. *See id.* The district court concluded the guest had no apparent authority and granted the defendant's motion to suppress evidence seized from the home as a result of the search. The Tenth Circuit affirmed, reasoning the officers who arrived at the home "had no information about his living arrangements. Thus, when they encountered [the third party] at the front door, they did not know who she was or what relationship she had to [the defendant] or to the residence." *Id.* at 1130 (alterations added). The Court held that under *Kimoana*, the officers were presented with an ambiguous situation and had a duty to investigate further. *See id.* Because they did not investigate who the guest was or her relation to the defendant's home, the government could not meet its burden of establishing apparent authority.

More recently, the Tenth Circuit held that "[o]nce officers reasonably believe that an individual has the authority to consent, we do not require them to keep investigating merely

9

because one can imagine some way that additional facts might alter their analysis." *United States v. Romero*, 749 F.3d 900, 907 (10th Cir. 2014). In *Romero*, the Court explained, "when officers know facts creating a presumption of authority to consent, the officers need not make further inquiry into authority unless they learn additional facts … that may undermine the presumption." *Id.* at 907.

The Court finds Ms. Montoya had apparent authority to consent to the search of Units B-29 and D-19. It was natural and reasonable for the officers at the time of the residential search and ensuing conversation with Ms. Montoya to believe she had mutual use of the storage units by virtue of joint access. *See Cos*, 498 F.3d at 1128 ("A third party has apparent authority if the officer has a reasonable belief that the third party has (1) mutual use of the property by virtue of joint access…"). It does not matter if this belief ultimately proved to be erroneous. *Andrus*, 483 F.3d at 716. Importantly, Ms. Montoya carried keys to the storage units and testified that she and her brother kept their late father's possessions there, implying mutual use, especially since officers knew they lived together. Although the testimony at the hearing conflicted as to whether Ms. Montoya's keys were "spares," officers still could have reasonably thought Defendant gave her a set of spare keys for her own use. And, Ms. Montoya told Agent Gooch she had been to the storage facility once and knew approximately where it was located. All of these facts support the reasonableness of the officers' understanding. This scenario is unlike *Cos*, where the officers had no idea who the third party was when she granted consent to search the home. The officers in *Cos* did not know what, if any, relationship the third party had to the defendant and they did not ask her if she lived at the home. *Cos* is thus distinguishable from the instant case where DEA officers had a conversation with Ms. Montoya about the storage units and what was kept there, and knew that she lived at the home with her brother.

Viewing this case under *Kimoana*, the Court concludes officers reasonably believed Ms. Montoya had authority to consent to the search of Units B-29 and D-19.  The Court agrees with the United States that the test for apparent authority is not a test of ownership.  The apparent authority doctrine gives officers leeway even if authority to consent ultimately proves to be wrong.  The key question is whether officers reasonably believed Ms. Montoya had permission to consent.  This case is similar to *Kimoana*, where the crucial facts were that officers knew the third party carried a key to the room and had stayed in the room, despite not being the registered guest.  Similarly here, after Officer Villegas found the receipt in Mr. Montoya's closet, DEA officers were aware Defendant was the listed renter of the storage units.  However, they were also aware that Ms. Montoya lived with Defendant, who is her brother, and that she carried keys to the storage units.  Officers had reason to believe that Ms. Montoya also stored belongings in the storage units based on the fact that she lived with her brother and had keys to the units. Indeed, officers knew their late father's belongings were stored in the units, providing further reason for the officers to believe that both Defendant *and* Ms. Montoya had equal right to access the units.

Moreover, the record contains no ambiguous facts related to apparent authority that would have rendered the officers' reliance on apparent authority unreasonable.  *See Kimoana*, 383 F.3d at 1222.  The single fact that Ms. Montoya was not a listed lessor of the units does not draw into question her authority to grant consent of the units.  *See id.* (indicating that the fact the third party was not a listed renter of the motel room, viewed in light of the circumstances as a whole, did not indicate the third party lacked authority to grant consent).

Moreover, under *Romero*, the officers did not have an obligation to continue investigating authority once Ms. Montoya told them she had keys and was able to generally describe what was

stored in the units.  There is no duty to continue investigating past the point of a reasonable demonstration of apparent authority.  Just because the officers could imagine ways in which Ms. Montoya may *not* have had authority, such a possibility does not alter the analysis.  *See Romero*, 749 F.3d at 907.

II.     Finally, the Court points out that at the suppression hearing, the United States explained the DEA officers did not obtain warrants to search Units B-29 and D-19 because they believed Ms. Montoya had authority to consent and had indeed consented, thus avoiding the need to obtain warrants.  The Court finds this argument further supports the officers' reasonable belief that Ms. Montoya had authority to consent to the search.  **Ms. Montoya Gave Voluntary Consent to Search the Storage Units.**

The Court concludes that Ms. Montoya's consent to the search of Units B-29 and D-19 was knowing and voluntary, and was not the product of coercion.  The parties disagree on whether Ms. Montoya consented to the search of the storage units when they were added to the consent form after she consented to search the four vehicles.  Agent Lemmon testified that after the search of the residence, and after Ms. Montoya consented to the vehicles, Agent Gooch asked if she would consent to storage units, to which she said yes.  Agent Gooch then added the three storage units to the consent form in her presence.  Agent Lemmon explained that Ms. Montoya was compliant and did not protest the storage units being added to the form.  Ms. Montoya, on the other hand, testified that she gave consent to search the four vehicles but not the storage units.  Rather, she claims she gave officers keys to the units so that they would not have to break the locks once they obtained a warrant.  She testified she did not consent to search the units because they did not belong to her.

Either Ms. Montoya consented or she did not; both accounts cannot be true.  Thus the Court must make a credibility determination.  After considering the totality of evidence, the Court credits the testimony of Officer Villegas and Agent Lemmon that Ms. Montoya voluntarily consented to search the storage units.  Some aspects of this case give the Court pause, and the consent determination is a close call.  The credibility issue would be less of a close call than it is had the officers taken a few seconds to require Ms. Montoya to initial the addition of the storage units to the existing consent form.  While the Government contends it did not need Ms. Montoya's written consent, that position belies the fact that officers obtained a written consent form in the first place for the four vehicles.  This explanation is rather inconsistent.  Nevertheless, the Court credits the Government's witnesses' testimony because the undisputed portions of the testimony support the United States' position.  It is undisputed that Ms. Montoya handed over her keys to the storage units to Agent Gooch.  The Court must find one side credible, and in this case it is the Government.

Defendant has not pointed to any indication of intimidation or overbearing conduct on the part of the officers.  Officer Villegas testified that he was approximately six feet away from Ms. Montoya when she was speaking with Agent Gooch, and that she was calm and cooperative throughout the entire conversation.  She was never placed under arrest or confined in any manner.  Agent Gooch spoke with her in a calm tone, and never displayed his weapon.  Ms. Montoya was seated on her couch, and was free to move around.  Agent Lemmon similarly testified that Ms. Montoya never became distressed, and was calm and cooperative.  Ms. Montoya testified that no officer ever pointed a weapon at her.

Although Defendant claims in the Motion that Ms. Montoya was threatened that her child would be taken away from her if she did not consent, at the hearing Defendant conceded that no

such threats ever took place.[1]  Thus, under the totality of the circumstances, the United States

met its burden of showing Ms. Montoya's consent was voluntary.

### III.    Ms. Montoya's Consent Was Valid despite Mr. Montoya's Prior Non-Consent.

Defendant next argues the search was performed over Mr. Montoya's objection, thus the

search was unconstitutional as to him.  Defendant claims this case is analogous to *Randolph*, 547

U.S. 103, 123–24 (2006), where a cotenant granted consent but the other cotenant (who was

present) refused consent.  The Supreme Court held, "a physically present inhabitant's express

refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow

occupant."  *Id.*  Defendant maintains the agents knew Ms. Montoya did not have authority to

consent because they knew from the receipt that Mr. Montoya was the owner of the storage units,

and the only way officers could have legally obtained consent was via Mr. Montoya.

The United States responds that Defendant was no longer present at the residence, having

been lawfully arrested and taken away from the premises, at the time Ms. Montoya consented to

the search of the storage units.  The United States directs the Court to the Supreme Court's

decision in *Fernandez v. California*, 134 S. Ct. 1126, 1132–34 (2014), which held that if the

person refusing consent is not present, having been lawfully removed, the consent of the person

granting consent is valid.

The Court finds *Randolph* is inapplicable to this case.  The Court's holding in *Randolph*

is limited to situations where the objecting occupant is physically present.  *See id.* at 1133.

Agent Lemmon and Officer Villegas both testified that Mr. Montoya had been arrested and

removed from the residence at the time his sister spoke with the police and provided the keys to

---

[1] At the hearing, Ms. Montoya testified that an officer told her that New Mexico Children, Youth and Families Department could remove her child because of the .22 firearm that was found in the residence in plain view where the child could potentially access it.  Despite the allegations to the contrary made in the Motion, Defendant conceded at the hearing that Ms. Montoya was *not* threatened with removal of her child if she did not consent.

the storage units.  Moreover, Mr. Montoya was arrested and removed for a legally valid reason, which was the marijuana located at the residence.  The Court finds both witnesses to be very credible, and both agents testified that Mr. Montoya was no longer present when his sister consented.  Over and over again, Defendant insists this case is analogous to *Randolph*, but Defendant is not correct.  Defendant ignores the undisputed testimony of two credible officers that Mr. Montoya had been arrested and lawfully removed from the residence when his sister provided keys to the storage units.  Thus *Randolph* is inapposite.

Having concluded that Ms. Montoya had apparent authority to consent to the search of Units B-29 and D-19, that she voluntarily consented to the search, and that any non-consent by Mr. Montoya did not invalidate his sister's consent, the Court need not consider whether the evidence located in the storage units would have inevitably been discovered.[2]

The United States has met its burden of establishing that the search of the storage units was constitutionally sound.  Ms. Montoya had apparent authority to consent, her consent was voluntary, and any non-consent by Mr. Montoya does not invalidate his sister's consent.  There is no basis to suppress the evidence discovered pursuant to the search of Units B-29 and D-19. Accordingly, for the reasons set forth in this Memorandum Opinion and Order, Defendant's Motion to Suppress (**Doc. 31**) is DENIED.

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE

---

[2] The United States focuses most of its Response on the doctrine of inevitable discovery, urging that even if the search was unconstitutional, the evidence in the storage units would have inevitably been found.  The Court would need to address the inevitable discovery doctrine only if it had found Ms. Montoya's consent was invalid. *See United States v. Olivares-Rangel*, 458 F.3d 1104, 1109 (10th Cir. 2006) ("The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered.").